**MAGNANIMO DEAN LAW, APC**
LAUREN A. DEAN (SBN 174722)
Email: Lauren@MagDeanLaw.com
5850 Canoga Avenue, Suite 400
Woodland Hills, CA 91367
Telephone: (818) 305-3450
Facsimile: (818) 305-3451

**GAINEY McKENNA & EGLESTON**
THOMAS J. MCKENNA
Email: tjmckenna@gme-law.com
GREGORY M. EGLESTON
Email: gegleston@gme-law.com
501 Fifth Avenue, 19th Floor
NY, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATHEW PUTZI, Derivatively On Behalf of RIVIAN AUTOMOTIVE, INC., | CASE NO.: |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| ROBERT J. SCARINGE, KAREN BOONE, SANFORD SCHWARTZ, ROSE MARCARIO, PETER KRAWIEC, JAY FLATLEY, AND PAMELA THOMAS-GRAHAM, | |
| Defendants, | |
| -and- | |
| RIVIAN AUTOMOTIVE, INC., | |

{Client Files-NEW/RIVI01/001/PLD/00100114.DOCX}    VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

1

|   | Nominal | ) |
|---|---|---|
|   | Defendant. | ) |
|   |   | ) |
|   |   | ) |
|   |   | ) |

Plaintiff Mathew Putzi ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Rivian Automotive, Inc. ("Rivian Automotive" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Rivian with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTTION

1.      This is a shareholder derivative action brought on behalf of and for the benefit of the Company, against certain of its officers and/or directors named as defendants herein seeking to remedy Defendants (defined below) violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and their breaches of fiduciary duties and other wrongful conduct as alleged herein. Defendants' actions have caused, and will continue to cause, substantial financial harm and other damages to the Company, including damages to its reputation and goodwill.

2.      Rivian is an electric vehicle ("EV") company that purports to design, develop, and manufacture category-defining electric vehicles and accessories and sell them directly to customers in the consumer and commercial markets.

3.      In 2018, Rivian unveiled its first consumer EVs: the R1T electric pickup truck and the R1S electric SUV.  According to the Registration Statement, the "R1T and R1S introduce our brand to the world and will serve as our flagship vehicles as we continue to expand our offerings."

4.      R1T sales began in September 2021 and R1S sales were planned to begin in December 2021.  As of October 31, 2021, the Company reported "approximately 55,400 R1T and R1S preorders in the United States and Canada from customers who paid a cancellable and fully refundable deposit of $1,000."  At the time of its IPO, the Company planned to produce approximately 1,200 R1Ts and 25 R1Ss by the end of 2021.  Based on the Company's production forecast, it expected to fill its 55,400 R1T and R1S backlog by the end of 2023.  Therefore, while the number of preorders underscored the Company's potential for success – that potential depended on customers ultimately completing their purchases once the Company's EVs became available.

5.      On November 10, 2021, the Company offered 153 million shares to the public through an IPO at a price of $78.00 per share for total proceeds of $11.93 billion.

6.      The Company's focus on its reputation for transparency and devotion to its customers, along with its R1T and R1S, including the large number of preorders and potential for increased demand were key selling points to IPO investors.

7.      However, the Registration Statement's representations were materially inaccurate, misleading, and/or incomplete because they failed to disclose, among other things, that the R1T and R1S were underpriced to such a degree that the Company would have to raise prices shortly after the IPO and that these price increases would tarnish the Company's reputation as a trustworthy and transparent company and would put a significant number of the existing backlog of 55,400

preorders along with future preorders in jeopardy of cancellation.

8.     Accordingly, the price of the Company's shares was artificially and materially inflated at the time of the Offering.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because the Company is incorporated in Delaware.

## PARTIES

**Plaintiff**

12.     Plaintiff Mathew Putzi acquired the Company securities and will continue to hold her Rivian shares throughout the pendency of this action.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

13.     Nominal Defendant Rivian is an electric vehicle automaker and automotive technology company that designs, develops, and manufactures electric vehicles and accessories and sells them directly to consumers and the commercial market.

**Director Defendants**

14.     ***Defendant Robert J. Scaringe*** ("Scaringe") is the founder of Rivian.

Defendant Scaringe is Chief Executive Officer ("CEO") and a Company director since 2009.  Defendant Scaringe has served as Chairman of the Board of Directors (the "Board") since 2018.  On April 27, 2022, the Company filed a Proxy Statement with the SEC (the "2022 Proxy Statement"). According to the 2022 Proxy Statement, Defendant Scaringe beneficially owns 11,995,467 shares of Rivian Class A stock and 7,825,000 shares of Class B stock, giving him 9.2% of the Company's voting control.

15.     **Defendant Karen Boone** ("Boone") is a director, Chair of the Audit Committee, and a member of the Compensation Committee.  Defendant Boone is also on the board of Peloton Interactive, Inc. ("Peloton").

16.     **Defendant Sanford Schwartz** ("Schwartz") is a director, Chair of the Compensation Committee, and a member of the Plant and Policy Committee. According to the 2022 Proxy Statement, Defendant Schwartz beneficially owns 126,258 Rivian Class A shares. Defendant Schwartz received $738,814 in compensation in the form of fees and stock and option awards for his service as a director in 2021.  Defendant Schwartz has served in several positions at Cox Enterprises, Inc, ("Cox"), a communications and automotive company, including most recently as CEO of the Cox Family Office since January 2021, guiding family investments and estate planning for the company's shareholders.  Cox, through its affiliate Manheim Investments, Inc. ("Manheim"), is one of the largest shareholders of Rivian.

17.     **Defendant Rose Marcario** ("Marcario") is a director and Chair of the Plant and Policy Committee.  According to the 2022 Proxy Statement, Defendant Marcario beneficially owns 64,701 Rivian Class A shares.  Defendant Marcario received $600,185 in compensation in the form of fees and stock and option awards for her service as a director in 2021.

18.     **Defendant Peter Krawiec** ("Krawiec") is a director since 2019.

According to the 2022 Proxy Statement, Defendant Krawiec beneficially owns 38,186 Rivian Class A shares. Defendant Krawiec received $1,180,709 in compensation in the form of fees and stock and option awards for his service as a director in 2021.  Since 2007, Defendant Krawiec has served in various leadership roles at Amazon.com., Inc. ("Amazon"), a multi-national technology company focused on e-commerce, cloud computing, digital streaming, and artificial intelligence, including as Vice President of Worldwide Corporate and Business Development since March 2021.  Amazon is the largest shareholder of Rivian.

19. **Defendant Jay Flatley** ("Flatley") is a director since 2021 and a member of the Audit Committee and the Nominating and Governance Committee. According to the 2022 Proxy Statement, Defendant Flatley beneficially owns 72,616 Rivian Class A shares.  Defendant Flatley received $731,187 in compensation in the form of fees and stock and option awards for his service as a director in 2021. Defendant Flatley is the CEO and Chair of the Board of Zymergen Inc. ("Zymergen"), a biotechnology company.

20. **Defendant Pamela Thomas-Graham** ("Thomas-Graham") is a director since 2021. Defendant Thomas-Graham is Chair of the Nominating and Governance Committee and a member of the Audit Committee.  According to the 2022 Proxy Statement, Defendant Thomas-Graham beneficially owns 20,713 Rivian Class A shares. Defendant Thomas-Graham received $995,296 in compensation in the form of fees and stock and option awards for her service as a director in 2021.  Defendant Thomas-Graham is also on the board of Peloton.

21. Defendants Scaringe, Boone, Schwartz, Marcario, Krawiec, Flatley and Thomas-Graham are referred to herein as the "Director Defendants".

## THE COMPANY'S CORPORATE GOVERNANCE

22. As members of Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's

business practices and policies and assuring the integrity of its financial and business records.

23.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Rivian, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

## DUTIES OF THE DIRECTOR DEFENDANTS

24.     By reason of their positions as officers, directors, and/or fiduciaries of Rivian and because of their ability to control the business and corporate affairs of Rivian, the Director Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Rivian in a fair, just, honest, and equitable manner.  The Director Defendants were and are required to act in furtherance of the best interests of Rivian and its shareholders.

25.     Each director and officer of the Company owes to Rivian and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

26.     The Director Defendants, because of their positions of control and authority as directors and/or officers of Rivian, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as

the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Rivian, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of Rivian.

27.    To discharge their duties, the officers and directors of Rivian were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Rivian were required to, among other things:

(a)    Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    Remain informed as to how Rivian conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary

{Client Files-NEW/RIVI01/001/PLD/00100114.DOCX}          VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

to comply with federal and state securities laws;

(e)   Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)   Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

28.   Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Rivian, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

29.   The Director Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*.   The Director Defendants' subjected the Company to the costs of defending, and the potential liability from, the securities class action.   As a result, Rivian has expended, and will continue to expend, significant sums of money.

30.   The Director Defendants' actions have irreparably damaged Rivian's corporate image and goodwill.

## **AUDIT COMMITTEE**

31.   The purpose of the Audit Committee is to prepare the Audit Committee Report required by the SEC to be included in the Company's Proxy Statement and

to assist the Board in overseeing and monitoring.

32.    The Audit Committee Charter states:

1.    Purpose

To oversee the accounting and financial reporting processes of Rivian Automotive, Inc. (the "Corporation") and the audits of the financial statements of the Corporation.

The Audit Committee's responsibilities are limited to oversight. The Corporation's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Corporation's financial statements. The Corporation's independent auditors are responsible for auditing and reviewing those financial statements.

***

**5.    Duties and Responsibilities**

The Audit Committee will have the duties and responsibilities set forth below.

**A.    Financial Statements and Financial Reporting**

(i)    Review significant accounting and reporting issues, including complex or unusual transactions and highly judgmental areas, and recent professional and regulatory pronouncements, and understand their impact on the Corporation's financial statements.

(ii)    Review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

(iii)   Review and discuss the Corporation's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

(iv)   Provide the Corporation with the report of the Audit Committee with respect to the audited financial statements for inclusion in each of the Corporation's annual proxy statements.

**B.   Risk Management and Compliance**

(i)   Review with management the Corporation's major financial risk and enterprise exposures and the steps management has taken to mitigate such exposures, including the structure, design, adoption and implementation of the Corporation's risk management policies and internal control systems.

(ii)   Review the scope of the internal and independent auditors' assessment of internal control over financial reporting, and obtain reports on any significant deficiencies and/or material weaknesses, together with recommendations and management's responses.

(iii)   Review and provide oversight with respect to the Corporation's policies and procedures for the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters.

**C.   Independent Auditor**

(i)   Directly approve the appointment, retention, termination, compensation, terms of engagement of and oversee the work of the independent auditor and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Corporation. The independent auditor and each such other registered public accounting firm must report directly to the Audit Committee.

(ii)   Pre-approve any audit and non-audit service provided to the Corporation by the independent auditor, unless the engagement

is entered into pursuant to appropriate preapproval policies established by the Audit Committee or if such service falls within available exceptions under SEC rules.

(iii)    Oversee the resolution of any disagreements between management and the independent auditor regarding financial reporting.

(iv)    Review and confirm the independence of the independent auditor by ensuring that the independent auditor prepares and delivers, at least annually, a written statement delineating all relationships between the independent auditor and the Corporation, actively engaging in a dialogue with the independent auditor with respect to any disclosed relationships or services that, in the view of the Audit Committee, may impact the objectivity and independence of the independent auditor, and, if the Audit Committee determines that further inquiry is advisable, taking appropriate action in response to the independent auditor's report to satisfy itself of the auditor's independence.

(v)    Discuss with the independent auditor any audit problems or difficulties and management's response.

## THE FALSE AND MISLEADING STATEMENTS

33.    The Registration Statement and Prospectus used to effectuate the Company's IPO contained untrue statements of material fact, and omitted information necessary in order to make the statements made therein not misleading, and omitted material facts required to be stated therein. Specifically, the Registration Statement misled investors with respect to the potential for significant reputational damage and cancellation of fully refundable preorders for its R1T and R1S EVs due to the Company's need to address its underpriced EVs by raising prices shortly after the IPO.

34.    As a new entrant into the automotive industry, the Registration Statement acknowledged that the Company faced the challenge of competing against current and potential manufacturers for sales:

Both the automobile industry generally, and the EV segment in particular, are highly competitive, and we will be competing for sales with both EV manufacturers and traditional automotive companies. Many of our current and potential competitors may have significantly greater financial, technical, manufacturing, marketing, or other resources than we do and may be able to devote greater resources to the design, development, manufacturing, distribution, promotion, sale and support of their products than we may devote to our products. We expect competition for EVs to intensify due to increased demand and a regulatory push for alternative fuel vehicles, continuing globalization, and consolidation in the worldwide automotive industry

35.     Indeed, at the time of its IPO, the Company was just beginning to produce and deliver its first consumer EVs.  The Registration Statement stated:

In the consumer market, we launched the R1 platform with our first-generation consumer vehicle, the R1T, a two-row five-passenger pickup truck, and began making customer deliveries in September 2021. As of September 30, 2021, we produced 12 R1Ts and delivered 11 R1Ts, and as of October 31, 2021, we produced 180 R1Ts and delivered 156 R1Ts. Nearly all of these vehicles were delivered to Rivian employees, and we expect to ramp deliveries to third-party customers as we increase our production rate. We plan to launch and commence customer deliveries for the R1S, a three-row seven-passenger sports utility vehicle ("SUV") in December 2021 following the completion of ongoing vehicle validation and all required testing. By the end of 2021, we intend to produce approximately 1,200 R1Ts and 25 R1Ss and deliver approximately 1,000 R1Ts and 15 R1Ss.

36.     The Company's ability to achieve success would depend on building a strong brand that encouraged adoption and customer loyalty.  Despite its status as newcomer to the industry, the Company enjoyed a great deal of excitement in the lead up to its IPO.  An article published in *The Wall Street Journal* on November 9, 2021, reported that the Company's IPO was "highly anticipated" and that:

On its roadshow pitch to investors, Rivian's bankers compared the company to electric-vehicle giant Tesla Inc., whose explosive share

increase has handed it a market capitalization of more than $1 trillion. Though Rivian is at a much earlier stage, has big losses and had no revenue until very recently, investors were clearly receptive and drawn to the company's growth potential.

37.    The Registration Statement also made the following representations regarding the Company's business and potential for growth:

Our diverse product portfolio and focus on inspiring people to get out and explore
the world positions us to build an enduring brand while addressing a wide range of future mobility and sustainability solutions. Through our base of preorders, we observe strong affinity for our brand which we expect to intensify as brand awareness grows and we welcome new customers to the Rivian community. As of October 31, 2021, we had approximately 55,400 R1T and R1S preorders in the United States and Canada from customers who each paid a cancellable and fully refundable deposit of $1,000. We believe the combination of our deep focus on addressing climate change, building compelling products, and delivering a superior customer experience will enable Rivian to drive adoption and customer loyalty, powering our continued growth.

38.    The Registration Statement highlighted factors that would add to the Company's success, including its direct customer relationships:

**The Rivian Advantage**

We designed all aspects of our ecosystem, business model, offerings, and organization to enable a scalable, customer-centric, and efficient approach, resulting in key competitive advantages.

***Direct Customer Relationships.***    We are a customer-centric organization. Our direct relationships with customers allow us to design solutions that best serve their needs, drive strong engagement, remove structural inefficiencies, create transparency, and increase customer satisfaction and referrals. Our relationships also serve as a medium for establishing a real-time feedback loop, through which we gather valuable data to improve our products and services. By controlling every customer touchpoint from awareness through ownership, we replace a patchwork of third parties with our end-to-end, integrated

solutions. We expect to deliver more value to customers along with a superior experience that will generate brand loyalty and increase adoption of our offerings.

39.     The Registration Statement also emphasized that "[o]ur first production vehicles, the R1T [and] R1S, . . . are our handshake with the world, the first step in building a relationship with customers.  We are focused on ensuring that this first experience with a Rivian vehicle creates excitement and passion for our brand."

40.     Also, the Registration Statement stated that "[o]ur vehicles occupy an attractive whitespace, addressing large, fast-growing, and high-margin market segments, and are designed to accelerate the large-scale adoption of sustainable transportation.  The R1T and R1S introduce our brand to the world and will serve as our flagship vehicles as we continue to expand our offerings."

41.     The Registration Statement reaffirmed these representations by making the following statements regarding the Company's focus on consumer experience:

**The Rivian Consumer Experience**

Our consumer journey has been holistically designed to create a seamless, end-to-end experience across the vehicle lifecycle, including awareness, engagement, conversion, delivery, and ownership.  As part of this journey, we have developed intuitive digital tools and robust infrastructure to deliver an exceptional experience.

Every aspect of our brand has been developed and is being managed inhouse to ensure we create a unique consumer journey that is difficult to replicate. Each step builds on the other, forming a completely integrated and seamless experience for our owners.

**Awareness**

We generate awareness without sacrificing authenticity. The Rivian brand keeps an honest, approachable, transparent tone and is designed around adventure. We have built our brand and its expressions in-house, spanning creative, marketing, design, digital development,

content production, events planning, and analytics. No agencies of record. No paid media. We rely on both shared and earned media to connect directly with our community through engaging content, rich digital experiences, and immersive events. Building awareness organically creates deeper bonds with our community and draws even more people in.

## **Engagement**

Every consumer interaction comes directly from Rivian; whether it is attending an event, subscribing to our digital content, or purchasing one of our vehicles. We do not rely on third parties or franchisees to engage with our consumers. This one-to-one connection starts at the earliest stages of our relationship, allowing us to form stronger bonds and more deeply understand our consumer. The centerpiece of our engagement approach is our comprehensive demo drive program. Traveling tour events in high-growth regions offer immersive driving experiences while forming connections with our community. To complement our touring drive events, we will also offer at-home drive experiences where we will bring vehicles to individual consumers for a truly personalized, curated experience. By designing our experiences entirely around our consumers we seek to create connection and trust, and a compelling case to move to the next step in the journey with us.

## **Conversion**

We have made buying a Rivian vehicle simple, transparent, and easy. There are no dealers to visit or complex, high-pressure sales tactics to endure. We have removed the uncomfortable haggling and unfair leverage typically encountered in the traditional dealership model. Our intuitive online ordering process replaces what otherwise requires several hours at a dealership, with a stress-free experience you can manage in minutes from your couch. Should an issue arise, every consumer has a dedicated Rivian Guide they can call, text, or email directly for help. If a consumer isn't satisfied, we offer the assurance of a hassle-free 7-Day, 1,000- Mile Return Policy. Removing barriers to purchase with helpful, proactive, frictionless shopping tools and customer service results in more willingness to try our brand, including our vehicles, accessories, services, and merchandise.

{Client Files-NEW/RIVI01/001/PLD/00100114.DOCX}      VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

42.    The Registration Statement also addressed the need to attract and retain a large number of customers:

> Our success depends on attracting a large number of potential customers to purchase our vehicles and the associated services we will provide to our customers. As of October 31, 2021, we had accepted preorders for approximately 55,400 R1Ts and R1Ss in the United States and Canada. Preorders are not commitments to purchase our R1T or R1S and are subject to cancellation by customers. If our existing preorder and prospective customers do not perceive our vehicles and services to be of sufficiently high value and quality, cost competitive and appealing in aesthetics or performance, or if the final production version of the R1S is not sufficiently similar to the drivable design prototypes, we may not be able to retain our current preorder customers or attract new customers, and our business, prospects, financial condition, results of operations, and cash flows would suffer as a result.

43.    As to nature of the Company's preorders, the Registration Statement noted:

> Deliveries of the R1T began in September 2021 and deliveries of the R1S are not expected to begin until December 2021 and may occur later or not at all.  As a result, we offer waitlist preorders for consumers with a cancellable and fully refundable deposit of $1,000. Deposits paid to preorder the R1T and R1S are cancellable by the customer until the customer enters into a lease or purchase agreement. Because all of our preorders are cancellable, it is possible that a significant number of customers who submitted preorders for our vehicles may not purchase vehicles.
>
> The potentially long wait from the time a preorder is made until the time the vehicle is delivered, and any delays beyond expected wait times, could also impact customer decisions on whether to ultimately make a purchase. Any cancellations could harm our business, prospects, financial condition, results of operations, and cash flows.

44.    Prior to the IPO, the Company originally announced base pricing for its R1T pickup truck and R1S SUV at $69,000 and $72,000, respectively.  In December

{Client Files-NEW/RIVI01/001/PLD/00100114.DOCX}        VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

17

of 2019, Tesla unveiled its Cybertruck with a base price of $39,900. In a January 26, 2020 article published on the website *Electek* titled "Rivian will start under expected $69,000 price – Cybertruck effect in action?" it was reported that Rivian adjusted its pricing to compete with Tesla.  According to the article, "Rivian now says that $69,000 will be the price for a 'well-equipped vehicle,' and that base model pricing will actually be lower than that."  The article noted that after federal tax credits for EVs (which Tesla no longer qualified for), "a new base model Rivian could net out to less than $50,000 all-told.  This would be quite impressive and even more disruptive than we originally thought."

45.     The Registration Statement failed to inform the market that it had underpriced the R1T and R1S to such a degree that Rivian would be forced to raise prices shortly after the IPO.  As a result, the above statements were materially inaccurate, misleading, and/or incomplete because they failed to disclose the potential for significant reputational damage and cancellation of fully refundable preorders for the R1T and R1S that would result from the Company's need to address its underpriced EVs by raising prices shortly after the IPO.

46.     For the foregoing reasons, in addition to being untrue and misleading because of affirmative untrue and misleading statements and omissions, the Company's Registration Statement also failed to comply with SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303").  Item 303 required the Company to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

47.     Defendants caused the Company to violate Item 303 by failing to disclose the risk of reputational damage and preorder cancellations related to the Company's need to raise prices on the R1T and R1S.

48.     The true facts regarding the Offering Documents emerged after news

broke that the Company was raising its prices.  On March 1, 2022, the Company reported that it was raising the prices of its R1T pickup and R1S SUV by 17 percent and 20 percent, respectively, and that the new prices would apply to nearly all preorders.  At the time of the announcement, the Company had only produced and sold roughly 1,000 vehicles.  Meanwhile, the number of preorders for the R1T and R1S had grown to approximately 71,000 as of December 15, 2021.

49.     In a statement to *Electrek*, the Company's chief growth officer, Jiten Behl, attributed the price increases to inflation and the fact that the prices were originally set in 2018:

> Like most manufacturers, Rivian is being confronted with inflationary pressure, increasing component costs, and unprecedented supply chain shortages and delays for parts (including semiconductor chips). This rise in cost and complexity due to these challenging circumstances necessitate an increase to the prices of the R1T and R1S models we offer today — prices which were originally set in 2018.  This decision will allow us to continue to offer competitive products that maintain the high standard of quality, performance and capabilities that our customers expect and deserve from Rivian. Along with the adjusted prices for our current offerings, we are also announcing Dual-Motor AWD and Standard battery pack options for R1T and R1S, which will provide a broader range of choices for customers as part of our expanding portfolio of options, upgrades and accessories.

50.     However, in response to Tesla's unveiling of its Cybertruck, the Company announced in 2020 that the pricing for the R1T and R1S was actually for a "well-equipped vehicle" and that the base model pricing would be lower.

51.     In addition, a March 2, 2022 article in the online publication *ARS Technica*, titled "Rivian surprises, outrages EV truck buyers with 20% price hike," questioned the reasons behind the price increases.  The article stated: "While inflation is likely part of the story, the price hike may have been planned for a while. In a lawsuit filed by Laura Schwab, the company's former VP of sales and marketing

who alleges the company has a 'toxic' bro culture,' concerns over profitability were raised in spring 2021."  The article quotes from the lawsuit, which was filed in the Superior Court of California for Orange County, on November 4, 2021, just days before the IPO, as follows:

> Beginning in spring of 2021, Ms. Schwab started to raise the alarm about concerns she had relating to Rivian's ability to deliver on its promises to investors. Shockingly, Mr. Behl dismissed her concerns and explicitly asked Ms. Schwab not to raise these issues in front of Mr. [RJ] Scaringe [Rivian's CEO].

> First, it was clear that the vehicles were underpriced, and each sale would result in a loss for the company. Ms. Schwab ultimately contacted Dennis Lucey, Rivian's Finance Director, and worked with him to develop projections showing how much of a loss the company would incur if Rivian did not raise prices. Ms. Schwab raised this issue with several executives, including Mr. Behl, Stuart Dixon (Director of Product Management), and Andy Zicheck (Principal Product Manager). Mr. Behl brushed her off. Eventually, Mr. [Patrick] Hunt [then-senior director of consumer digital] raised the issue with Mr. Behl, at which point Mr. Behl agreed that they would need to raise the vehicle prices after the IPO.

52.     Customers who had placed $1,000 refundable deposits for the Company's vehicles configured to their individual preferences were understandably furious.  Online Rivian forums, social media, and news publications were rife with examples of outrage toward Rivian.  One poster on the Company's Owner Forum wrote "I'm out. Terrible way to treat early adopters."   Another individual commented:

> My quoted price previously was $78,820 for an R1S after going through the configurator to get the same vehicle it's $92k. A 17k increase is not inflation – it means it wasn't priced appropriately to begin with.  Add-in the new 'option' for a dual motor which is position as a great new option but in reality it just means they are now charging you more for the quad motor which was previously the only option. This feels like a

gigantic bait and switch. I may be losing interest at this point as well…

53.     An article published in *Electrek* on March 2, 2022, titled "Rivian buyers are cancelling at alarming rates after price increases," noted that "A poll on the Rivian subreddit, one of the biggest communities of Rivian fans, gives us a better idea of the pulse of the reservation holders, and it shows a high cancelation rate."

54.     Reservation holders also expressed their anger toward the Company by posting screen shots of their preorder cancellations to reddit and other social media platforms. As an example, a reddit user posted the following screen shot under the heading "Another Long Term Supporter Cancelling[.]"

55.     By the close of trading on March 1, 2022, the Company's share price had fallen to $61.91 per share, down $5.65 per share from the previous day's close of $67.56 per share.  The Company's shares plummeted further the following day, closing at $53.56 per share on March 2, 2022.

56.     In a futile attempt at damage control, the Company's CEO issued a letter on March 3, 2022, apologizing to customers for breaking their trust and walking back the price increases by stating that the Company would honor original prices for preorders placed prior to the price increase announcement. In the letter, Defendant Scaringe wrote that "Earlier this week, we announced pricing increases that broke the trust we have worked to build with you[,]" and "The most important aspect of what we are building is our relationship with all of you. As we demonstrated earlier this week, trust is hard to build and easy to break."

57.     Despite agreeing to honor original pricing for existing preorders and allowing customers who cancelled to reinstate their orders, the damage to the Company's reputation was already done.  A March 3, 2022 article in *The Wall Street Journal* titled "EV Startup Rivian Walks Back Price Increase, Apologizes to Customers," shared the following from a now-former Rivian customer:

{Client Files-NEW/RIVI01/001/PLD/00100114.DOCX}       VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Paul Morgan, 39-year-old California resident, expected Rivian's prices to go up a couple thousand dollars to account for inflation. When he received notice that the price on his preordered Rivian SUV would increase $19,000, he drew the line.

"Within five seconds of seeing the new price I clicked the cancel button," Mr. Morgan said. Even after learning that his original price would be honored, he said he didn't reinstate his order.

## THE COMPANY'S FALSE AND MISLEADING 2022 PROXY

58.     On April 27, 2022, Defendants caused the Company to file its 2022 Proxy Statement with the SEC soliciting shareholder votes to, among other things, elect Defendants Scaringe, Krawiec, and Schwartz to the Board.  The 2022 Proxy Statement was issued by order of the Board and signed by Defendant Scaringe.

59.     The 2022 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures:

Risk assessment and oversight are an integral part of our governance and management processes.  Our Board of Directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with the Board of Directors at regular Board of Directors meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks. Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of the Board of Directors that address risks inherent in their respective areas of oversight. While our Board of Directors is responsible for monitoring and assessing strategic risk exposure, our Audit Committee is responsible for overseeing our major financial risk and enterprise exposures and the steps our management

has taken to mitigate such exposures, including the structure, design, adoption and implementation of our risk management policies and internal control systems. The Audit Committee also oversees management of cybersecurity risks and approves or disapproves any related person transactions. Our Compensation Committee is responsible for overseeing the management of risks relating to our executive compensation plans and arrangements. Our Nominating and Governance Committee manages risks associated with the independence of our Board of Directors and governance matters…. The Board of Directors does not believe that its role in the oversight of our risks affects the Board of Directors' leadership structure.

60. The 2022 Proxy Statement represents that the Company's culture is collaborative, omitting the gender discrimination faced by Schwab and other Company employees:

Coming together to do more than we can on our own.

Building a collaborative culture is critical for us to deliver on our mission – the complexity of our products and customer ecosystems means that a wide range of skillsets and backgrounds must work closely together to make thousands of decisions every day.

The degree to which we are successful in continuing to build and maintain our collaborative culture will directly translate to our ability to create beautifully curated and holistically integrated customer experiences. This cross-system view is also foundational for our ability to achieve our sustainability and carbon neutrality targets.

61. The foregoing statements in the 2022 Proxy Statement were false and misleading and omitted material information.  Contrary to the representations made in the Proxy, the Board was required, but failed to: (a) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing the Company's core operations and making truthful, accurate, and complete statements to investors and customers; (b) effectively oversee the material risks facing the Company; and (c) investigate and

take action when presented with red flags regarding misconduct in connection with the Company's pricing strategy, production capabilities, representations to investors and customers, and the Company's corporate culture.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

62.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Defendants' violations of Section 14(a) of the Exchange Act, and their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred during the Relevant Period.

63.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

64.     Plaintiff is a current owner of the Company stock and have been an owner of Company stock during the Relevant Period.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

65.     Because of the facts set forth herein, Plaintiff has not made a demand on the Board of the Company to institute this action against the Director Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

66.     At the time this suit was filed, the Board was comprised of seven (7) members -- Scaringe, Boone, Schwartz, Marcario, Krawiec, Flatley and Thomas-Graham.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, four (4), could not exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

67.     The Director Defendants face a substantial likelihood of liability in this

{Client Files-NEW/RIVI01/001/PLD/00100114.DOCX}        VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   action because they caused the Company to issue false and misleading statements

2   concerning the information described herein.  Because of their advisory, executive,

3   managerial, and directorial positions with the Company, the Director Defendants

4   had knowledge of material non-public information regarding the Company and were

5   directly involved in the operations of the Company at the highest levels.

6        68.    The Director Defendants either knew or should have known of the false

7   and misleading statements that were issued on the Company's behalf and took no

8   steps in a good faith effort to prevent or remedy that situation.

9        69.    The Director Defendants (or at the very least a majority of them) cannot

10  exercise independent objective judgment about whether to bring this action or

11  whether to vigorously prosecute this action.  For the reasons that follow, and for

12  reasons detailed elsewhere in this Complaint, Plaintiff did not make (and was

13  excused from making) a pre-filing demand on the Board to initiate this action

14  because making a demand would have been a futile and useless act.

15       70.    Each of the Director Defendants approved and/or permitted the wrongs

16  alleged herein to have occurred and participated in efforts to conceal or disguise

17  those wrongs from the Company's stockholders or recklessly and/or with gross

18  negligence disregarded the wrongs complained of herein and are therefore not

19  disinterested parties.

20       71.    Each of the Director Defendants authorized and/or permitted the false

21  statements to be disseminated directly to the public and made available and

22  distributed to shareholders, authorized and/or permitted the issuance of various false

23  and misleading statements, and are principal beneficiaries of the wrongdoing alleged

24  herein, and thus, could not fairly and fully prosecute such a suit even if they instituted

25  it.

26       72.    Additionally, each of the Director Defendants received payments,

27  benefits, stock options, and other emoluments by virtue of their membership on the

28  {Client Files-NEW/RIVI01/001/PLD/00100114.DOCX}     VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

1   Board and their control of the Company.

2      **THE DIRECTOR DEFENDANTS WERE NOT INDEPENDENT**

3   **Defendant Scaringe**

4      73.   Defendant Scaringe is the Company's Founder and CEO. Defendant

5   Scaringe is also a Board member.  Defendant Scaringe is not disinterested or

6   independent, and therefore, is incapable of considering demand because Defendant

7   Scaringe (as CEO) is an employee of the Company who derives substantially all of

8   his income from his employment with the Company, making him not independent.

9   As such, Defendant Scaringe could not independently consider any demand to sue

10  himself for breaching his fiduciary duties to the Company, because that would have

11  exposed him to liability and threaten his livelihood.

12     74.   This lack of independence and financial benefits received by Defendant

13  Scaringe renders him incapable of impartially considering a demand to commence

14  and vigorously prosecute this action.

15     75.   Further, Defendant Scaringe is also a defendant in the securities class

16  actions entitled *Crews v. Rivian, Inc., et al.*, Case 2:22-cv-01524 (C.D. Cal.) and

17  *Horvath v. Rivian, Inc., et al.*, Case 8:22-cv-00444 (C.D. Cal.) ("Securities Class

18  Actions").

19     76.   In addition, Defendant Scaringe signed the 2022 Proxy Statement

20  containing false and misleading statements and material omissions and faces a

21  substantial likelihood of liability therefor.

22     77.   Defendant Scaringe is seeking to benefit from the violation of Section

23  14(a) of the Exchange Act by securing his re-election to the Board through the false

24  and misleading statements and material omissions in the 2022 Proxy Statement.

25  **Defendant Boone**

26     78.   Defendant Boone is named as a defendant in the Securities Class

27  Actions.  As such, Defendant Boone is incapable of considering a demand to

28  {Client Files-NEW/RIVI01/001/PLD/00100114.DOCX}     VERIFIED SHAREHOLDER DERIVATIVE
    COMPLAINT

26

commence and vigorously prosecute this action with the required independence and disinterest.

79.    Further, Defendant Boone authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability.  Moreover, Defendant Boone has a long-standing business relationship with Defendant Thomas-Graham which precludes them from acting in an independent and disinterested manner.  Defendant Boone has been a director on the board of Peloton alongside Defendant Thomas-Graham for more than three years.

**Defendant Schwartz**

80.    Defendant Schwartz is named as a defendant in the Securities Class Actions.  As such, Defendant Schwartz is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

81.    Defendant Schwartz authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability.  Defendant Schwartz is seeking to benefit from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

82.    In addition, Defendant Schwartz has served in multiple positions at Cox, a communications and automotive company, over the last thirty-seven (37) years including most recently as CEO of the Cox Family Office since January 2021, helping to guide family investments and estate planning for the company's shareholders. Manheim, an affiliate of Cox, owns approximately 39,262,248 Rivian Class A shares, with total voting control of 4.2%. Cox designated Schwartz as a director of the board in 2019.  Defendant Schwartz would not investigate and take

action against those responsible since it would devalue that substantial investment.

83.     Cox also entered into a Master Subscription Agreement with Rivian in November 2020 to provide products and services to support Rivian's consumer vehicle sales.

84.     Defendant Marcario is named as a defendant in the Securities Class Actions.  As such, Defendant Marcario is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

85.     Defendant Marcario authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability.

**Defendant Krawiec**

86.     Defendant Krawiec is named as a defendant in the Securities Class Actions. As such, Defendant Krawiec is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

87.     Defendant Krawiec authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability.

88.     Defendant Krawiec is seeking to benefit from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

89.     Since 2007, Defendant Krawiec has served in various leadership roles at Amazon, including as Vice President of Worldwide Corporate and Business Development since March 2021.  Amazon is the largest shareholder of Rivian with beneficial ownership of approximately 159,522,782 Rivian Class A shares and total

voting control of 18.1%. According to the IPO Prospectus, Defendant Krawiec shares voting control and investment power over Amazon's shares in Rivian. Defendant Krawiec would not investigate and take action against those responsible since it would devalue that substantial investment. Further, Amazon also nominated Defendant Krawiec as a director per a nominating agreement outlined in the 2022 Proxy Statement.

90. Further, in February 2019, Rivian entered into an agreement with Amazon and its affiliates to provide 100,000 vehicles for Amazon's delivery fleet. The deal is discussed at length in the IPO Prospectus and reveals how dependent Rivian is on Amazon.

91. Also, since 2016, Rivian uses Amazon Web Services, Inc., an Amazon affiliate, for cloud computing services.

**Defendant Flatley**

92. Defendant Flatley is named as a defendant in the Securities Class Actions. As such, Defendant Flatley is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

93. Defendant Flatley authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability.

94. In addition, Defendant Flatley is the CEO and Chair of the Board of Zymergen, a biotechnology company. J.P. Morgan Securities LLC ("J.P. Morgan"), Goldman Sachs & Co. LLC ("Goldman Sachs"), and BofA Securities, Inc ("BofA Securities"), the underwriters for Rivian's IPO, also acted as underwriters for Zymergen's initial public offering on April 22, 2021. J.P. Morgan, Goldman Sachs, and BofA Securities are named defendants in the securities class actions and Defendant Flatley would not take any action to jeopardize their defense therein.

**Defendant Thomas-Graham**

95.     Defendant Thomas-Graham is named as a defendant in the Securities Class Actions.  As such, Defendant Thomas-Graham is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

96.     Defendant Thomas-Graham authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability.

97.     Defendant Thomas-Graham has a long-standing business relationship with Defendant Boone which precludes them from acting in an independent and disinterested manner. Defendant Thomas-Graham has been a director on the board of Peloton alongside Defendant Boone for more than three (3) years.

**Defendants Boone, Flatley and Thomas-Graham**

98.     Defendants Boone, Flatley and Thomas-Graham served as members of the Audit Committee at all relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  As alleged herein, Boone, Flatley and Thomas-Graham failed to ensure the integrity of the Company's internal controls, allowing the materially misleading financial statements to be disseminated in the Company's SEC filings and other disclosures. Thus, Boone, Flatley and Thomas-Graham breached their fiduciary duties and are not interested, and demand is excused as to them.

## COUNT I

### (Against the Director Defendants for Violations of Section 14(a) Of The Exchange Act)

99.     Plaintiff incorporates by references and realleges each and every allegation contained above, as though fully set forth herein.

100.    The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The Section 14(a) claim alleged herein does not allege and does not sound in fraud.  Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

101.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that: "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

102.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

103.    The 2022 Proxy Statement was materially false and misleading because the Director Defendants failed to maintain adequate internal controls and conduct the required oversight, over the Company's pricing strategy, production capabilities, and corporate culture.  The Director Defendants also failed to implement and maintain an effective system of internal controls to ensure the timely disclosure of truthful, accurate and complete information as required by the securities laws, which has resulted in the Company being named a defendant in the Securities Class

{Client Files-NEW/RIVI01/001/PLD/00100114.DOCX}        VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

31

1    Actions.

2        104.    The misleading information contained in the 2022 Proxy Statement was

3    material to Rivian's shareholders in determining whether to elect Defendant

4    Scaringe, Krawiec, and Schwartz to the Board.

5        105.    The material misstatements and omissions in the 2022 Proxy Statement

6    damaged the Company.

7        106.    Plaintiff, on behalf of the Company, seeks relief for damages inflicted

8    upon the Company based on the misleading 2022 Proxy Statement in connection

9    with the improper election of certain members of the Board.

10                                    **<u>COUNT II</u>**

11            **<u>(Against Director Defendants for Breach of Fiduciary Duty)</u>**

12        107.    Plaintiff incorporates by reference and realleges each and every

13    allegation contained above, as though fully set forth herein.

14        108.    The Director Defendants owed the Company fiduciary obligations.  By

15    reason of their fiduciary relationships, the Director Defendants owed the Company

16    the highest obligation of good faith, fair dealing, loyalty, and due care.

17        109.    The Director Defendants violated and breached their fiduciary duties of

18    care, loyalty, reasonable inquiry, and good faith.

19        110.    The Director Defendants engaged in a sustained and systematic failure

20    to properly exercise their fiduciary duties.  Among other things, the Director

21    Defendants breached their fiduciary duties of loyalty and good faith by allowing or

22    permitting false and misleading statements to be disseminated in the Company's

23    SEC filings and other disclosures and, otherwise failing to ensure that adequate

24    internal controls were in place regarding the serious business reporting issues and

25    deficiencies described above.  These actions could not have been a good faith

26    exercise of prudent business judgment to protect and promote the Company's

27    corporate interests.

28    {Client Files-NEW/RIVI01/001/PLD/00100114.DOCX}      VERIFIED SHAREHOLDER DERIVATIVE
      COMPLAINT

111.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

112.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### (Against Director Defendants for Waste of Corporate Assets)

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

115.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle actions addressing Defendants' unlawful actions.

116.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

117.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

{Client Files-NEW/RIVI01/001/PLD/00100114.DOCX}        VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)     Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)     Finding Defendants liable for breaching their fiduciary duties owed to the Company;

(C)     Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)     Awarding damages to the Company for the harm the Company suffered as a result of the Defendants' wrongful conduct;

(E)     Awarding damages to the Company for Defendants violations of Section 14(a) of the Exchange Act;

(F)     Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(G)     Awarding such other and further relief as is just and equitable.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 2, 2022

**MAGNANIMO DEAN LAW, APC**


By: */s/ Lauren A. Dean*
        LAUREN A. DEAN (SBN 174722)
5850 Canoga Avenue, Suite 400
Woodland Hills, CA 91367
Telephone: (818) 305-3450
Facsimile: (818) 305-3451

{Client Files-NEW/RIVI01/001/PLD/00100114.DOCX}       VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

34

Email: Lauren@MagDeanLaw.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: egleston@gme-law.com

***Attorneys for Plaintiff***

{Client Files-NEW/RIVI01/001/PLD/00100114.DOCX}        VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>VERIFICATION</u>**

    I, MATHEW PUTZI, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Rivian Automotive, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Rivian Automotive, Inc. common stock at all relevant times.

                                           5-30-2022

                              MATHEW PUTZI

1